UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID BULGER,  )
 )
 Plaintiff,  )
 )
 v.  )  No. 11 C 6835
 )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,  )
 )
 Defendant.  )

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff David Bulger seeks judicial review of the final decision of the Commissioner of

Social Security denying his claim for Social Security Disability Insurance Benefits under Title II of

the Social Security Act. Bulger filed a Motion for Summary Judgment (Dkt. No. 9) requesting that

the Commissioner's decision be set aside or reversed and remanded. The Commissioner also filed

a Motion for Summary Judgment (Dkt. No. 14) requesting that the Commissioner's decision be

affirmed. For the reasons set forth below, Bulger's motion (Dkt. No. 9) is denied, the

Commissioner's motion (Dkt. No. 14) is granted, and the Commissioner's final decision is affirmed.

## BACKGROUND

Bulger filed a Title II application for a period of disability and disability insurance benefits

on March 19, 2009. (*See* R. at 12.) Bulger alleged that he was disabled as of November 8, 2007,

because he suffered from mental illness, including dysthymic disorder and an anxiety disorder, and

because he suffered from chronic back, leg, and hip pain. (*Id.*) The Administrative Law Judge

("ALJ") denied Bulger's claims initially on June 19, 2009, and on rehearing on October 26, 2009.

(*Id.*) Bulger then requested a hearing, which was held on August 31, 2010, by the assigned ALJ. (*Id.*)

On November 23, 2010, the ALJ denied Bulger's application for a period of disability and disability insurance benefits. Bulger requested review of the ALJ's decision, and the Social Security Administration's Appeals Council denied his request on July 29, 2011 (R. at 1-4), making the November 23, 2010, ruling by the ALJ the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561 (7th Cir. 2009). Bulger filed his complaint in this court on September 28, 2011, seeking judicial review of the Commissioner's final decision. (Dkt. No. 1.) Cross motions for summary judgment were filed.

## STANDARD OF REVIEW

The court performs a *de novo* review of the ALJ's legal conclusions, while giving deference to the ALJ's factual determinations. *Jones v.Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). In other words, the court "will uphold the Commissioner's decisions so long as the ALJ applied the correct legal standard and substantial evidence supported the decision." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *see also* 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Jones*, 623 F.3d at 1160 (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). When reviewing for substantial evidence, the court does not substitute its own judgment for that of the ALJ by re-weighing evidence or making credibility determinations. *Skinner*, 478 F.3d at 841. The court does, however, require that the ALJ adequately explain his decision by building "a 'logical bridge' between the evidence and the conclusions so that [the court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones*, 623 F.3d at 1160 (quoting *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

## ANALYSIS

The Social Security Administration requires an ALJ to follow a five-step process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a). The five-step process requires the ALJ to ask:

> 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience.

*Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). When applying those steps, "[a] negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Id.*

Here, the ALJ found at step one that Bulger was unemployed, and at step two that he suffered from the severe impairments of dysthymic disorder (a type of depression) and anxiety. (R. at 14-15.) At step three, the ALJ determined that Bulger's impairments did not meet the requirements of any of the regulatory listings. (R. at 15-16.) At step four, the ALJ found that Bulger's mental illness affected him somewhat, but that he was capable of performing work with "nonexertional limitations that restrict him to simple routine repetitive work involving three or four step tasks." (R. at 16.) The ALJ also found that this impairment did not prevent Bulger from working in his former occupation as a stock clerk, so the ALJ determined that Bulger was not disabled. (R. at 20-21.) The ALJ determined in the alternative that Bulger could work as a janitor, assembler, or hand packager. (R. at 21.)

Bulger contends that the ALJ erred first by discounting the opinions of Bulger's treating

psychiatrist, Dr. Gardner, and his treating therapist, Carrie Knudsen, in her determination that Bulger was able to perform work as a stock clerk. In the context of disability determinations, "[a] treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citations omitted). If the treating physician's opinion does not merit controlling weight, the ALJ must determine the weight it deserves by considering "'the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.'" *Id.* at 740 (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)). The ALJ must express "good reasons" for discounting the treating physician's opinion. *Id.* at 739 (citations omitted).

Here, both Dr. Gardner and Knudsen checked the box "no" in response to a question on a medical report asking if Bulger was "able to function in a competitive work setting . . . on an eight-hour per day, five days per week basis?" (R. at 350, 371.) The ALJ discounted those opinions because neither Dr. Gardner nor Knudsen explained their opinions, and because the treatment records did not support the statements. (R. at 19.)

Those justifications are sufficient to support the ALJ's decision.[1] Neither Dr. Gardner nor Knudsen provided any explanation for their decision to check "no" in response to the question about Bulger's ability to work. The absence of reasoning behind the physician's opinion is a sufficient reason for rejecting it. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions

---

[1] The Commissioner contends that Knudsen's opinion does not deserve the deference accorded the opinions of treating physicians because she is a therapist, not a doctor. The court will not consider that argument because the ALJ did not rely on it in her decision. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (forbidding "an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced").

upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that an ALJ was justified in rejecting a physician's opinion that was "conclusory and unsupported by the evidence"); *see also Gildon v. Astrue*, 260 F. App'x 927, 929 (7th Cir. 2008) ("An ALJ is not required to accept a doctor's opinion if it 'is brief, conclusory, and inadequately supported by clinical findings.'" (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).

As Bulger points out, there is some information in the treatment records that potentially could support Dr. Gardner's and Knudsen's opinions. For example, they note that

> on June 24, 2008 Plaintiff had soft and pressured speech, blunted affect, impaired judgment, impaired concentration and only fair insight. On June 23, 2009, Plaintiff had an anxious mood, poor problem solving and poor insight into his illness. On December 15, 2009 Dr. Gardner noted Plaintiff had impaired concentration, low energy, impaired problem solving, was inattentive and distractible and had only fair insight into his illness.

(Dkt. No. 17, at 2 (citations omitted).) At no point, however, does the treatment record or the treating physicians' opinions explain how those symptoms would prevent Bulger from engaging in work with the limitations the ALJ specified. The ALJ thus properly discounted the opinions.

Moreover, the ALJ extensively documented Bulger's treatment history and the reasons why it contradicted the opinions of Dr. Gardner and Knudsen, including the frequent occasions on which treating physicians reported that Bulger's symptoms were minor or absent. (*See* R. at 18.) To cite just a few examples, on August 21, 2008, Bulger denied "chronic problems with attention and concentration" (R. at 291.) Similarly, in June and September 2009, Bulger reported that he was "not severely depressed" and actually "doing ok even though I can't find a job like most of the population." (R. at 351). In July 2010, Bulger was "feeling good—superfine," and his motivation, energy, appetite, and concentration were intact. (R. at 397.) Contrary to Bulger's arguments, the

evidence in the medical record does not establish only that Bulger occasionally had a good day in the midst of serious mental illness. To the contrary, the treatment records that the ALJ cited document that Bulger was often free from serious symptoms for extended periods:

> [O]n June 25, 2008 . . . [Bulger] denied abnormal or psychotic thoughts . . . On August 21, 2008, he said that his depression comes and goes, usually in connection with work situations, and that he has fatigue, headache, and loss of focus only during major episodes. In fact, he denied chronic problems with attention and concentration, and he did not think he was too impulsive. . . . He said that he only felt down three or four days a month. . . . In January 2009 he denied depressive symptoms . . . .

(R. at 18 (citations omitted).) That evidence, and the other evidence that the ALJ documented, is sufficient to justify the ALJ's decision to discredit the treating physicians' opinions.

Bulger points out that there is other evidence in the record that arguably supports Dr. Gardner's and Knudsen's opinions, most notably that he had GAF scores that were frequently between 41 and 50. GAF stands for "Global Assessment of Functioning," a numeric scale that mental health professionals use to indicate "a clinician's assessment of the individual's overall level of functioning." *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). A level from 41-50 represents "serious symptoms of mental illness or serious impairment in social functioning." *Martin v. Astrue*, 345 F. App'x 197, 199 (7th Cir. 2009) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 30-32 (4th ed. 1994)).

The GAF score is itself nothing more than a tool to allow a physician to express his opinion of the severity of a patient's symptoms. *See Fisher v. Astrue*, No. 1:06-cv-1741, 2007 WL 4150314, at *6 (S.D. Ind. Nov. 14, 2007) (Hamilton, J.) (affirming the ALJ despite the ALJ's failure to address the claimant's GAF scores, because "[t]he GAF scale is not a diagnosis but is intended to be used to make treatment decisions and to measure the impact of a course of treatment"); *cf. Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of

considerable help to the ALJ in formulating the [residual functional capacity ("RFC")], it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."). Accordingly, the GAF scores alone cannot provide sufficient support to Dr. Gardner's and Knudsen's opinions.

Next, Bulger contends that the ALJ's assessment that Bulger lacked credibility when he described his complaints was not justified. The ALJ must provide "'specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting Soc. Sec. Ruling 96–7p). The ALJ cited ample evidence to justify his finding that Bulger was not credible. For example, the ALJ noted that although Bulger stated in 2009 that he had not used marijuana for five years (R. at 308), he stated in August 2008 that he used marijuana occasionally at concerts (R. at 291), and he stated in April 2008 that he had smoked marijuana a couple of months before (R. at 276). (R. at 19.) That inconsistency supports the decision to discount Bulger's testimony. *See* Soc. Sec. Ruling 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

The ALJ further noted that he discounted Bulger's complaints about back pains because Bulger did not seek treatment during the period he asserted he suffered from the pain. That inference is also justified. *See id.* ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . ."). The ALJ also discounted Bulger's claims of his inability to function because of evidence in the record indicating that he took part in

a variety of daily activities, including household chores, yard work, playing music in a band, and shopping. (R. at 17-18; *see also* R. at 31, 36-37, 199-201, 285.) Contrary to Bulger's characterization, the ALJ's reasoning was based on specific facts contradicting Bulger's claims about his limitations. (*See, e.g.*, R. at 17 ("[Bulger] complains of being distracted, but he is part of a band, which rehearses weekly, and which plays at bars. He is obviously able to handle being in public and work in coordination with others and around people."); R. at 19 ("[Bulger] has consistently continued to apply for work during the period since the alleged onset date . . ., which suggests that inability to obtain work, as opposed to inability to perform work [as Bulger asserted], may be a motivation behind the current application.").)

Perhaps most significantly, the ALJ also credited the opinion of one of Bulger's treating physicians, who stated that Bulger appeared to be exaggerating his symptoms in an attempt to get social security benefits. (R. at 19, 346.) The doctor explained that:

> Client seems to be putting all of his energy into obtaining SSDI. . . . Client seems fearful of getting a job as his p[re]vious jobs have not ended well. He does not want to work in an environment where he has to interact with anyone. Even though client has not been seeking employment he plays in a band and has had several opportunities to play with the band at local events. This does not inhibit him in anyway [sic]. He can interact socially with band members and some of the people he meets at these occasions. It is due to this that writer does not see client as needing disability at this time. Cl[ie]nt appears to be malingering. Client states that the SSDI is there for the taking and that he is [e]ntitled to the benefits.

(R. at 346.) That opinion, which the ALJ paraphrased (R. at 19), provided ample grounds for the ALJ to discount Bulger's credibility.

Bulger's next argument is that the ALJ erred by failing to consider certain evidence in the record, including evidence that Bulger suffered from chronic back, leg, and hip pain. Specifically, Bulger points to the assessment of a physician on June 16, 2009, indicating that Bulger was limited

to occasionally carrying fifty pounds, frequently carrying twenty-five pounds, standing or walking for only six hours a day, sitting for six hours a day, and occasionally stooping or crouching. (R. at 326-33.) The ALJ did not mention that assessment. Even if the ALJ had accepted its findings, however, the assessment would have limited Bulger to work of no more than medium exertion. *See* 20 C.F.R. § 404.1567(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."). It thus would not have excluded work as a stock clerk, janitor, assembler, or hand packager. (*See* R. at 21.) In addition, at the hearing the ALJ asked the vocational expert if there were any jobs available to an individual in Bulger's position, who can lift fifty pounds occasionally, lift twenty-five pounds frequently, stand for up to six hours, and sit for up six hours. The vocational expert responded that such an individual could work as a stock clerk, janitor, assembler, or hand packager. (R. at 42-43.) Accordingly, any error in failing to assign Bulger physical limitations consistent with the June 16, 2009, assessment was harmless, as an individual with those limitations still could have performed the work the ALJ found Bulger could perform. *See Sahara Coal Co. v. OWCP*, 946 F.2d 554, 558 (7th Cir. 1991) ("The harmless-error doctrine is available in judicial review of administrative action; it is an exception to the *Chenery* principle. . . . If the outcome of a remand is foreordained, we need not order one." (citations omitted)). Bulger's argument fails.

Finally, Bulger contends that the ALJ failed to consider Bulger's statements that he needed to take frequent naps. The ALJ's discussion of Bulger's credibility (R. at 17-18) is sufficient to explain why the ALJ did not place any stock in those statements, however. There is no reversible error.

## CONCLUSION

For the reasons explained above, Bulger's motion for summary judgment [9] is denied, and the Commissioner's motion for summary judgment [14] is granted. The final decision of the Commissioner denying Bulger disability benefits is affirmed. Civil Case Terminated.

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: December 14, 2012